# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

STEPHANIE SPEARS,

       **Plaintiff,**     **Case No. 22-2454-DDC**

v.

THERMO FISHER SCIENTIFIC,

       **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff Stephanie Spears brings claims against her former employer, defendant Thermo Fisher Scientific, for race discrimination, retaliation, sex discrimination, national-origin discrimination, and violating the Equal Pay Act. She alleges defendant failed to promote her based on her race or sex; terminated her employment based on her race or sex; retaliated against her for reporting race discrimination; and failed to pay her equally to her male coworkers. Defendant has moved for summary judgment against all claims. Doc. 138. Plaintiff's response to this motion falls short of the necessary mark in many different ways.

On the factual side, plaintiff's attempts to dispute defendant's facts often are cursory or unsupported by citations to the summary-judgment record. As a result, she's failed to controvert defendant's story about plaintiff's work performance—*i.e.*, her difficulties meeting deadlines, her challenges to deliver adequate work product, and her struggles to communicate effectively with her colleagues. She urges the court to strike several of defendant's summary-judgment declarations, but she does so without carefully combing through the documents or engaging the requisite legal analysis.

On the legal side, plaintiff's arguments also are wanting.  She never explains why she threw national-origin discrimination into the Pretrial Order, despite never asserting such a claim during the first three years of this lawsuit.  She also misunderstands the statute of limitations for her failure-to-promote claims.  For her timely failure-to-promote claims, plaintiff never bothers to argue that defendant's stated reason for hiring another candidate was pretextual.  For her claims that defendant illegally discriminated against her by firing her, plaintiff admits to the reason defendant fired her:  she failed to complete a Performance Improvement Plan.  Also, plaintiff fails to show that this reason for her termination is pretextual largely because she only mentions the word "pretext" twice in her 54-page brief.  Plaintiff more or less abandons her retaliation claims, dooming them.  And finally, plaintiff ignores black-letter law that an Equal Pay Act claim requires her to adduce evidence beyond merely her colleagues' job titles, so that claim fails, too.

The court thus grants defendant's Motion for Summary Judgment (Doc. 138), ending all plaintiff's claims.  It explains this result in detail, below.

## I.      Background

Before the court reaches the facts, it must settle a few disputes that will define the scope of those facts.  It begins with plaintiff's complaints about the declarations defendant submitted with its summary-judgment motion.  It then considers defendant's complaints about plaintiff's attempts to controvert its summary-judgment facts.  Once those disputes are resolved, the court then can proceed to the facts governing defendant's motion.

### A.      Defense Declarations

Plaintiff's summary-judgment response relies heavily on her claim that the court should exclude declarations from defense witnesses Jaako McVey, James McMackin, and Kyley Eng. Doc. 141 at 47–49.  Defendant designated these three witnesses as corporate representatives

2

under Fed. R. Civ. P. 30(b)(6) but, in plaintiff's view, they "were poorly prepared for their depositions[.]" *Id.* at 47. To demonstrate this purportedly poor preparedness, plaintiff proffers the following portions of each witness's deposition.

Defendant designated McVey to testify about plaintiff's 2022 Performance Improvement Plan (PIP); plaintiff's performance during her employment; and PIPs given to similarly situated employees. *See* Doc. 131 at 3–4, Doc. 141 at 36. In portions of McVey's deposition that plaintiff cites, McVey couldn't recall:

- the specific tasks that plaintiff performed at a "yellow" level in 2018, Doc. 141-3 at 8 (McVey Dep. 124:1–11);

- plaintiff's "clear strength" on her 2018 review, *id.* at 9 (McVey Dep. 125:13–17); and

- what "Cheryl" said that plaintiff said after Cheryl had a difficult phone call with plaintiff, Doc. 141-4 at 4 (McVey Dep. 203:11–13).

Doc. 141 at 36–37.[1]

Defendant designated McMackin to testify about defendant's categorization of positions; the positions' corresponding pay ranges; and salary and demographic information about similarly situated employees. Doc. 131 at 3–4, Doc. 141 at 36. To demonstrate that McMackin was poorly prepared, plaintiff cites portions of the deposition where McMackin:

- didn't know the specifics about one of the roles—which role, exactly, remains unclear—plaintiff applied for, Doc. 141-5 at 3 (McMackin Dep. 59:4–18);

---

[1]    Plaintiff also cites McVey's deposition at page 226. Doc. 141 at 37. But plaintiff's excerpts from McVey's deposition don't include page 226. *See* Doc. 141-3; Doc. 141-4. It's not the court's job to go hunting for this page. *See Cross v. Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (explaining that, on a motion for summary judgment, "it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record" and the district court has no obligation "to comb the record in order to make the [party's] arguments for him" (quotation cleaned up)). And defendant's excerpts from McVey's deposition don't include page 226, either. *See generally* Doc. 139-6. Because plaintiff has failed to support the fact allegedly found at page 226 with a cite to the summary-judgment record, the court won't consider this fact. D. Kan. Rule 56.1(b)(1) (requiring parties opposing summary judgment to cite particular portions of the summary-judgment record).

3

- testified that, to prepare to testify about pay ranges for positions to which plaintiff applied, he looked at slides but didn't "look at anything specifically around her applications for any of these roles," *id.* at 4 (McMackin Dep. 60:4–18).

*See* Doc. 141 at 36.

Defendant designated Eng to testify about:  plaintiff's job responsibilities; the job responsibilities of the positions plaintiff applied to; defendant's hiring and promotion policies and procedures; and details about the hiring decisions for each position where plaintiff applied. Doc. 131 at 2–3, Doc. 141 at 37.  Plaintiff complains that, at the Rule 30(b)(6) deposition, Eng:

- didn't have any information about plaintiff's day-to-day responsibilities in her global-brand-manager position other than the responsibilities listed in the job description, Doc. 141-2 at 10–11 (Eng Dep. 26:22–27:13); and

- discovered that defendant's application tracking system didn't list plaintiff's application for a global-senior-marketing-manager position, *id.* at 21–32 (Eng Dep. 81:20–92:18).[2]

Doc. 141 at 37–38.[3]  It's worth pausing to expand on that second bullet point.

Plaintiff argues that Eng couldn't explain why defendant's system didn't have any record of plaintiff's application or interview for that position.  *Id.*  Not so.  Eng offered two possible explanations.  Eng explained that, to comply with European data-privacy laws, an applicant can delete their profile from defendant's system.  Doc. 141-2 at 15 (Eng Dep. 49:4–20).  Eng wasn't sure if plaintiff had done so, but Eng was confident that, if plaintiff had applied to the position, the system would have a record of that application.  *Id.* (Eng Dep. 49:21–24).  Later in her

---

[2]     In further support of this assertion, plaintiff cites "Eng Depo Ex. 57–66." Doc. 141 at 38.  Citing ten exhibits—in their entirety—does not satisfy plaintiff's obligation to cite the summary-judgment record with particularity.  *See Cross*, 390 F.3d at 1290.  And as best as the court can tell, plaintiff attached only exhibit 57 to Eng's deposition.  *See* Doc. 141-2 at 34–46.

[3]     Plaintiff also asserts that Eng had no information about the qualifications of the candidates who secured the positions.  Doc. 141 at 38.  In support of this assertion, plaintiff cites pages 97 and 98 of Eng's deposition.  *Id.*  But plaintiff didn't include pages 97 and 98 of Eng's deposition in her selected excerpts.  *See* Doc. 141-2.  Nor do defendant's excerpts include these pages.  *See generally* Doc. 139-10. The court thus disregards this unsupported assertion.

deposition, Eng found the position in the system and didn't find plaintiff among the list of applicants. *Id.* at 27–28 (Eng Dep. 87:21–88:3). Eng didn't know, firsthand, why plaintiff wasn't listed as an applicant, but suggested that plaintiff was applying internally, to a position within her group, so she likely knew the leadership team. *Id.* at 30 (Eng Dep. 90:2–19). In that situation, Eng testified that "it's not uncommon" for the application and interview to happen informally, without a formalized record in the system. *Id.* at 30–31 (Eng Dep. 90:20–91:12). In sum, the court disregards plaintiff's assertion that Eng couldn't explain why plaintiff's application was missing because the summary-judgment record simply doesn't support her assertion.

Shifting back to the matter at hand, plaintiff claims that McVey, McMackin, and Eng failed "to provide answers to questions directly related to the properly noticed 30(b)(6) topics" and so defendant can't rely "on post-deposition affidavits . . . from corporate representatives who previously testified Defendant lacked knowledge of the relevant facts[.]" Doc. 141 at 47. Plaintiff thus claims that these affidavits are "inadmissible." *Id.* at 49. Plaintiff has overplayed her hand.

Though she fails to cite the relevant legal authority, plaintiff is making a sham-affidavit argument. "A 'sham affidavit' is one which makes a statement directly contrary to previous sworn testimony in an attempt to defeat summary judgment by manufacturing a dispute of material fact." *Carbajal v. St. Anthony Cent. Hosp.*, No. 12-cv-02257-REB-KLM, 2015 WL 3896902, at *3 n.7 (D. Colo. June 23, 2015). Cases with sham affidavits are "unusual." *L. Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009). "The threshold question is whether a declaration conflicts with the declarant's prior sworn testimony." *Ibarra v.*

5

*Lee*, No. 22-5094, 2023 WL 6939236, at \*3 (10th Cir. Oct. 20, 2023).  Plaintiff hasn't made this threshold showing.

Nowhere does plaintiff identify any specific facts on which the witnesses' depositions contradict their declarations.  Doc. 141 at 47–49.  As demonstrated in the bullet points above, McVey, McMackin, and Eng lacked knowledge about narrow topics.  McVey couldn't recall the "yellow" tasks on plaintiff's 2018 review, plaintiff's clear strength on her 2018 review, or a hearsay-laden statement from another employee.  McMackin didn't know the specific duties of an unknown job plaintiff applied for and looked at "slides" to testify about pay ranges, rather than plaintiff's applications.  Eng's sin, according to plaintiff, was reading the responsibilities listed in plaintiff's job description to testify about plaintiff's job responsibilities.  Plaintiff doesn't bother to cite any specific part of Eng's declaration that contradicts this testimony.  Doc. 141 at 47–49.  And the court won't do plaintiff's work for her—with Eng or any other defense witness.  *See Ibarra*, 2023 WL 6939236, at \*3 (placing burden to demonstrate sham fact issue on party attacking declaration).

Even if plaintiff had made that threshold showing and demonstrated a contradiction, that's not the end of the analysis.  When deciding "whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).  "If there is a conflict, the next question is whether the declaration 'is simply an attempt to create a sham fact issue.'"  *Ibarra*, 2023 WL 6939236, at \*3 (quoting *L. Co.*, 577 F.3d at 1169).  To determine if an affidavit or declaration attempts to create such a sham fact issue, our Circuit has instructed district courts to evaluate whether:  "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was

6

based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." *L. Co.*, 577 F.3d at 1169 (quotation cleaned up).

Plaintiff hasn't even acknowledged these elements of the analysis, much less applied them. Doc. 141 at 47–49. So, she hasn't shouldered her burden to demonstrate that defendant's declarations attempt to create sham fact issues, and the court thus will consider the declarations at summary judgment.[4]

### B.    Carla Owen Declaration

Plaintiff also takes issue with Carla Owen's declaration. Doc. 141 at 47. But it's not clear why. Unlike the three witnesses the court just addressed, plaintiff doesn't assert that Owen served as a Rule 30(b)(6) witness. *See id.* And plaintiff never identifies any conflicts between Owen's declaration and a deposition. *See id.* at 47–49. Given plaintiff's poor showing on this issue, the court will consider Owen's declaration at summary judgment.

### C.    Plaintiff's Attempt to Controvert Facts

Plaintiff's summary-judgment-fact struggles aren't over yet. Defendant complains that dozens of plaintiff's attempts to controvert defendant's summary-judgment facts fail to cite any summary-judgment evidence. Defendant is right.

A party disputing a fact must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). If a party fails to address properly another party's summary-judgment facts, "the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2); *Coleman*

---

[4]    The court recognizes that, beyond plaintiff's sham-declaration argument, she has other objections to these declarations—*i.e.*, personal-knowledge objections. The court will consider these objections separately, for each specific fact.

*v. Blue Cross Blue Shield of Kan., Inc.*, 287 F. App'x 631, 635 (10th Cir. 2008) ("Faced with pleadings that did not comply with either the local practice rule or summary judgment practice in general, the district court was correct to admit all facts asserted in [defendant's] summary judgment motion that are not controverted by a readily identifiable portion of the record." (quotation cleaned up)).

As demonstrated in the footnotes of the below facts section, plaintiff has failed to follow these rules on many occasions. She controverts dozens of defendant's facts by merely stating that the fact is controverted, without citing to any facts of her own. Occasionally plaintiff attacks defendant's cited support directly. But many of plaintiff's attempts to controvert defendant's facts fall short. Rather than making a broad statement about these facts, though, the court opts for an individualized approach, and tackles each fact individually, below. On to the facts of this case.

### D.    The Summary Judgment Facts

Below, the court identifies the facts that control defendant's motion for summary judgment. They consist of undisputed facts and, sometimes, disputed facts, that are expressed in the light most favorable to plaintiff—the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Plaintiff is an African American female. Doc. 137 at 2 (PTO ¶ 2.a.i.). She has a bachelor's degree in biology with a minor in chemistry. Doc. 139-3 at 3 (Owen Decl. ¶ 7). She also holds a master's degree in divinity studies. *Id.*

Plaintiff began working for defendant in 2005. Doc. 137 at 2 (PTO ¶ 2.a.ii.). During the time relevant here, plaintiff reported to Jaakko McVey. *Id.* (PTO ¶ 2.a.viii.). At the time defendant discharged plaintiff, she held the internal title of "Product Management Specialist III" and the business title of "Global Brand Manager—Environmental Monitoring." *Id.* (PTO

8

¶ 2.a.iv.). And, at the time of her discharge, plaintiff worked in defendant's Microbiology Division, within the Specialty Diagnostics Group. *Id.* (PTO ¶ 2.a.vii.). As a Global Brand Manager, plaintiff oversaw certain products manufactured in Lenexa, Kansas, and Europe. *Id.* (PTO ¶ 2.a.vi.). As a Product Management Specialist III, defendant categorized plaintiff as a "Band 6" employee. *Id.* (PTO ¶ 2.a.v.).

Over the course of her employment, plaintiff applied for several different internal positions. Defendant declined to hire her for those positions, and these decisions form the basis of plaintiff's failure-to-promote claim. The court covers these positions in detail in its failure-to-promote analysis.

### *Plaintiff's Work Performance*

Defendant uses a traffic-light system to evaluate its employees: green means good, yellow means concerns, and red means missing goals. Doc. 141-3 at 6 (McVey Dep. 122:5–16). Plaintiff's 2018 year-end performance review rated plaintiff "At Standard" overall. Doc. 139-2 at 23 (McVey Decl. Ex. A). Of plaintiff's five performance goals, her supervisor rated one green, three yellow, and one red. *Id.* at 18–21.

In 2019, before plaintiff received her year-end review, she "was aware" of "disappointed stakeholders[.]" Doc. 139-5 at 57 (Pl. Dep. 156:12–17). And, in 2019, plaintiff asked to work remotely because of a personal relationship and her global position. *Id.* at 61 (Pl. Dep. 162:8–20). The court will cover plaintiff's remote-work request in more detail, later in this background. McVey completed plaintiff's 2019 year-end performance review. Doc. 139-2 at 38 (McVey Decl. Ex. E). McVey rated plaintiff's overall performance "At Standard." *Id.* at 45. And of plaintiff's four performance goals, McVey rated one green, two yellow, and one red. *Id.* at 38–43.

In 2020, McVey asserts that plaintiff "met challenges" when concluding projects and delivering on goals. *Id.* at 7 (McVey Decl. ¶ 18). Plaintiff's 2020 year-end review rated her overall performance "At Standard." *Id.* at 63 (McVey Decl. Ex. G). The review also rated two performance goals green and two performance goals red. *Id.* at 54–61. The review mentions incomplete projects and communication difficulties—topics covered next. Plaintiff also worked part-time for the Census Bureau and the IRS in 2020. Doc. 139-5 at 68–69 (Pl. Dep. 175:3–176:20).

### B. cepacia Project

In 2020, defendant put plaintiff in charge of launching a product called B. cepacia. Doc. 139-2 at 6 (McVey Decl. ¶ 16). The project came in late, and incomplete. *Id.* McVey claims that plaintiff "failed to follow Thermo Fisher's product launch manual in launching the product and developed an inadequate training presentation for the product, which caused confusion regarding distinctions between the new product and another product Thermo Fisher already offered." *Id.* Plaintiff disputes that she caused the delay. Plaintiff's 2020 performance review mentions that the B. cepacia launch "was crippled with a 5 month back order which is not resolved." *Id.* at 55 (McVey Decl. Ex. G).

By the time of plaintiff's mid-2021 review, the B. cepacia project had delivered $45,000 in revenue. *Id.* at 7 (McVey Decl. ¶ 20). This figure fell below the revenue target of $1 million. *Id.* Plaintiff shifts the blame away from her. She testified that "the organisms would not grow in the lab, so it kept failing" quality control. Doc. 141-1 at 7 (Pl. Dep. 151:9–16). This project would continue to cause trouble and was included in plaintiff's 2022 PIP. In July 2022, plaintiff hadn't met her PIP deadlines for the B. cepacia product. Doc. 139-2 at 14 (McVey Decl. ¶ 39); *id.* at 120 (McVey Decl. Ex. Q). Plaintiff's final PIP progress review from September 2022 also mentions missed deadlines for the B. cepacia project. *Id.* at 128 (McVey Decl. Ex. S).

### *Data Entry Project*

In 2020, defendant gave plaintiff a data-entry project. *Id.* at 6–7 (McVey Decl. ¶ 17). Plaintiff failed to provide the necessary information, despite McVey's repeated attempts to speak with her and get her to complete the project. *Id.* It was a large project that would enable defendant to sell product and plaintiff's failure to complete the project caused defendant to miss out on revenue.[5] *Id.* at 8 (McVey Decl. ¶ 22). Plaintiff maintains that she ultimately completed the project, citing a July 2022 progress-review note reflecting that she'd completed a project called "RSD Product loads" by the end of the month. *Id.* at 128 (McVey Decl. Ex. S).

### *Plaintiff's 2021 Performance*

Backtracking a bit—to 2021—McVey asserts that plaintiff's performance worsened in 2021. *Id.* at 7 (McVey Decl. ¶ 19). The court just described specific problems with plaintiff's projects in 2021. According to McVey, plaintiff failed to complete another task: helping grow defendant's sales of a product in China. *Id.* at 8 (McVey Decl. ¶ 21). Plaintiff's failure to complete this task adequately led the China sales team to give up on selling the product.[6] *Id.*

Plaintiff's mid-year performance review in 2021 had five performance goals, and plaintiff received one green, one yellow, and three red. *Id.* at 67–70 (McVey Decl. Ex. H). McVey emphasized plaintiff's goal to build "a winning Team in Pharma." *Id.* at 68. McVey noted that

---

[5]     Plaintiff attempts to controvert this, asserting that McVey lacks personal knowledge. Doc. 141 at 14. She never develops this position beyond this cursory assertion, however. Meanwhile, McVey's declaration explicitly provides that he has personal knowledge of its contents. Doc. 139-2 at 2 (McVey Decl. ¶ 1). What's more, McVey has worked in marketing for defendant since 2013, and he's managed plaintiff since 2019. *Id.* at 2–3 (McVey Decl. ¶¶ 5–6). Given this evidence and plaintiff's lack of argument, the court concludes that McVey has personal knowledge of this fact.

[6]     Plaintiff asserts that this fact is "not supported by admissible evidence and does not establish the absence of a genuine dispute." Doc. 141 at 14. To be frank, such a broad statement, without any explanation or citation to summary-judgment evidence, leaves the court at a loss for what plaintiff means. Perhaps plaintiff meant to reference her dispute about McVey's declaration. The court already has decided that issue against her. *See above* § I.A. So, this fact properly is uncontroverted for summary-judgment purposes.

11

plaintiff, based on feedback he'd received from others, required "significant improvement" in the following areas:  (i) plaintiff's challenges collaborating across multiple regions; (ii) plaintiff frequently no-showing to meetings and responding late to emails; (iii) stakeholders frustrated with plaintiff's engagement and tone; and (iv) plaintiff's "tendency to strike out in a direction without engaging key stakeholders[.]"  *Id.* at 69.  And so the mid-year 2021 review stated that someone would assemble a corrective action plan.  Doc. 137 at 7 (PTO ¶ 2.a.xiv.).

### *Plaintiff's Communication*

In McVey's view, plaintiff's "greatest deficiency" was "her communication style and refusal to listen to others."  Doc. 139-2 at 10 (McVey Decl. ¶ 28).  In April 2020, McVey had a one-on-one meeting with plaintiff to discuss a project and plaintiff's workload.  *Id.* at 86 (McVey Decl. Ex. K).  According to McVey's email to human-resources recounting the meeting, plaintiff complained that her workload was too high, McVey was micro-managing her, and McVey was being condescending.  *Id.*  There's two sides to that story, though.  McVey wrote that plaintiff's "tone is tending towards bullying and may have the potential to unfold further."  *Id.*  Plaintiff calls McVey's email "an effort by McVey to 'put in writing' or document negative commentary about Plaintiff to an HR professional with no understanding of Plaintiff's job duties or position."  Doc. 141 at 11.  But she cites zero facts to support this assertion.

To further demonstrate plaintiff's shortcomings with communication, McVey described an incident where a marketing employee complained to McVey after a conversation with plaintiff.  Doc. 139-2 at 10 (McVey Decl. ¶ 29).  Plaintiff had missed deadlines, so the marketing employee had asked plaintiff for certain things.  Doc. 141-4 at 3 (McVey Dep. 202:3–20).  According to McVey, the conversation "snowballed into an argument" and "ended without resolution."  *Id.* (McVey Dep. 202:18–24).  When McVey spoke with plaintiff about this

12

incident, plaintiff refused to accept accountability for the way she spoke to the marketing employee.[7]  Doc. 139-2 at 10 (McVey Decl. ¶ 29).

As another example, McVey describes receiving a call from a sales manager in Italy in which the sales manager complained about plaintiff.  Doc. 141-4 at 8–9, 11–12 (McVey Dep. 207:19–208:8, 210:25–211:12).  Plaintiff was responsible for a product introduction, but the product wasn't available, and the sales manager contacted plaintiff.  *Id.* at 8–9 (McVey Dep. 207:21–208:3).  McVey testified that, according to the sales manager, plaintiff "was very agitated, quite angry," and "lashed out at" the sales manager "for making unreasonable requests."  *Id.* at 9 (McVey Dep. 208:6–8).  When McVey reached out to plaintiff about this, plaintiff told him that she had "some challenges in setting the product up and getting the product shipped[.]"[8]  *Id.* at 14 (McVey Dep. 213:3–10).

McVey also gives several examples of plaintiff hanging up on her coworkers.  McVey accuses plaintiff of hanging up on the sales manager.  Doc. 139-2 at 11 (McVey Decl. ¶ 31).  McVey claims that plaintiff also hung up on him in 2019 when a dispute arose over plaintiff's booking of business travel.[9]  *Id.*  And in 2021, plaintiff, McVey, and McVey's supervisor were

---

[7]    Plaintiff tries to controvert this fact, asserting it's "unsupported by admissible evidence, not supported by a declarant with personal knowledge, and does not establish the absence of a genuine dispute."  Doc. 141 at 11.  Plaintiff's just throwing arguments at the wall, hoping that one of them will stick.  She doesn't explain why McVey's declaration is inadmissible on this topic.  Nor does she explain why he purportedly lacks personal knowledge.  To the contrary, plaintiff cites a portion of McVey's deposition in which he recounts his conversation with the marketing employee and provides his understanding of events.  *See* Doc. 141-4 at 2–8 (McVey Dep. 201:23–207:7).  And the deposition is consistent with McVey's declaration:  plaintiff didn't take accountability.  *Id.* at 8 (McVey Dep. 207:3–7).  So, none of plaintiff's arguments stick.

[8]    Plaintiff tries her arguments-at-the-wall approach with this fact, too, Doc. 141 at 12, but it fails for the same reason that her arguments about the marketing employee failed:  she offers perfunctory arguments and cites McVey's deposition in which he obviously has personal knowledge of the calls he received complaining about plaintiff, *see above* n.7.

[9]    Plaintiff claims this fact and others like it are "[c]ontroverted" and that they do "not establish the absence of a genuine dispute."  Doc. 141 at 12.  Saying something won't make it so.  Plaintiff hasn't

on a call in which the supervisor asked plaintiff about her progress on certain tasks and plaintiff refused to answer, questioned why she was on the call, and hung up. *Id.* (McVey Decl. ¶ 32). McVey further asserts that plaintiff hung up on an internal conference call after an employee asked for an update about one of her projects.[10] *Id.* at 11–12 (McVey Decl. ¶ 33). Plaintiff also belittled a marketing manager who had asked her to complete overdue content.[11] *Id.* And plaintiff told a sales manager—who had asked for information after plaintiff failed to respond to requests—that the request wasn't a priority and didn't interest her. *Id.*

### *Remote Work Requests*

Plaintiff's work location presented another sticking point in her employment. Plaintiff's position as a Global Brand Manager was based in Lenexa. Doc. 139-3 at 4 (Owen Decl. ¶ 11); *see also id.* at 19 (Owen Decl. Ex. B). Plaintiff nevertheless lived in Maryland part-time in 2019 and 2020. Doc. 141-1 at 5 (Pl. Dep. 31:10–18). In June 2019, plaintiff filed a request with human resources to reclassify her job from on-site in Lenexa to a fully remote position. Doc. 139-2 at 4 (McVey Decl. ¶ 11). In November 2019, plaintiff told McVey that she and her fiancé planned to move from Lenexa, and she requested to work fully remotely. *Id.* at 5 (McVey Decl. ¶ 12). Defendant denied this request. *Id.* McVey delivered plaintiff the news and recounted his conversation in an email. *Id.* at 35–36 (McVey Decl. Ex. D).

---

cited any summary-judgment evidence that controverts McVey's statement, so these facts are uncontroverted.

[10]    Plaintiff tries to controvert this fact by asserting that McVey doesn't have personal knowledge. Doc. 141 at 12. But once again, McVey's declaration explicitly states that he has personal knowledge of the declaration's contents. Doc. 139-2 at 2 (McVey Decl. ¶ 1). And plaintiff's bare assertion to the contrary doesn't provide the court any reason to doubt that statement.

[11]    Plaintiff attempts to controvert this fact by asserting that it is "not supported by admissible evidence and does not establish the absence of a genuine dispute." Doc. 141 at 12. That's it. There's no cite to contradictory evidence, no argument, and no explanation. This sort of argument won't suffice. *See above* § I.C. This fact (and the next one) are uncontroverted.

According to that email, McVey told plaintiff that she needed to remain Lenexa-based for "for operational reasons." *Id.* at 35. Plaintiff responded that her "performance was exceptional and she should not be penalized based on her being female, African American[.]" *Id.* McVey told plaintiff this wasn't so, and explained that plaintiff's mid-year performance review had shown a lack of progress in key areas. *Id.* So, McVey worried that a remote-based role wouldn't improve plaintiff's performance. *Id.* After her conversation with McVey, plaintiff complained about the decision to a human-resources employee, and expressed her belief that the outcome of her remote-work request was "different than what she ha[d] seen in other global roles."[12] *Id.* at 34.

When the pandemic hit in 2020, plaintiff spent 25% of her time in Kansas City and 75% of her time in Maryland. Doc. 141-1 at 6 (Pl. Dep. 32:8–13). In August 2020, plaintiff submitted a second request to work remotely full time. Doc. 139-2 at 6 (McVey Decl. ¶ 14). Plaintiff's supervisor, McVey, denied this request, and listed three reasons: (1) "60% of the product portfolio managed by the role is manufactured in Lenexa and as such interaction with key site functions is necessary on a routine basis"; (2) "[l]eadership see that the role is 'representative' of brand marketing in Lenexa engaging with internal customers on a routine basis"; and (3) plaintiff's role required her to lead "customer focused improvement activities and training on-site[.]" *Id.* at 51–52 (McVey Decl. Ex. F).

---

[12] Plaintiff asserts that "she reported that her exclusion from conferences with the rest of the MBD Marketing team (which included no Black Americans) was punitive and discriminatory." Doc. 141 at 8. In support of this proposition, plaintiff cites Exhibit 39 from her deposition. *Id.* But Exhibit 39 makes no mention of plaintiff reporting anything about anyone excluding her from conferences. Doc. 141-1 at 12–13 (Pl. Dep. Ex. 39). Plaintiff thus has failed to support her putative fact with competent summary-judgment evidence, leaving the court with no choice but to ignore it.

In June 2020, a human-resources employee reached out to McVey about plaintiff's post-pandemic working plan.  Doc. 141-24 at 2 (Pl. Ex. 24).  McVey wanted plaintiff in Lenexa.  *Id.*  The human-resources employee told McVey,

> I've realized that over 60% of marketing roles are remote.  And of the Lenexa based roles, the only diverse employees across the U.S. team happen to be Lenexa based.  So we want to make sure that we have a fair and consistent rationale as to why marketing roles are remote or not remote in total.

*Id.*  In September 2020, McVey again sought to have plaintiff start reporting to work in Lenexa two to three days per week.  Doc. 141-16 at 2–3 (Pl. Ex. 16).  It's not clear what came of this effort.

In August 2021, defendant implemented its post-pandemic plan and began requiring its U.S.-based employees to work on-site a few days per week.  Doc. 139-2 at 9–10 (McVey Decl. ¶ 27).  McVey asked plaintiff when she'd return to working in Lenexa.  *Id.*  Plaintiff suggested December 2022.  *Id.*  McVey told plaintiff that this proposal didn't comply with company policy, so if she wanted to work remotely until December 2022, she'd need to submit a request.  *Id.*  Plaintiff submitted a request, but McVey denied it.  *Id.*  McVey gave four reasons for denying this request:

(1) "significant underperformance that has increased and not been resolved by Stephanie being remote over the preceding 18 months";

(2) the "frequency of travel request to Lenexa, even during the pandemic, indicate the requirement for the role to be office based";

(3) though plaintiff's role was global, global doesn't always mean remote, and plaintiff had the flexibility to handle the time-zone challenges of a global role with a basic home-office setup; and

(4) a fellow Product Management employee's success as a Lenexa-based employee demonstrated the need for plaintiff to work in Lenexa.

*Id.* at 81–82 (McVey Decl. Ex. J).

16

Plaintiff asserts that McVey didn't deny her request due to her performance issues. Doc. 141 at 16. Instead, plaintiff suggests that McVey believed "Plaintiff would resign if forced to return to the Lenexa site in-person[.]" *Id.* But plaintiff doesn't have any evidence to support her suspicion about McVey. All she has is the September 2020 email in which McVey wanted plaintiff to return to work. Doc. 141-16 at 2–3 (Pl. Ex. 16). Plaintiff merely is speculating about why McVey denied her request. Speculation won't do. *Est. of Hurtado ex rel. Hurtado v. Smith*, 119 F.4th 1233, 1238 (10th Cir. 2024) ("Summary judgment requires more than mere speculation." (quotation cleaned up)).

In an October 2021 email, McVey explained to plaintiff that he'd denied her request to work remotely because "the business believes this product management position is best supporting our business, our internal stakeholders and our customers when based at the Lenexa site. This is consistent with other product management peer roles." Doc. 139-2 at 100 (McVey Decl. Ex. M).

### *Performance Improvement Plan*

In the fall of 2021, McVey determined that he needed to put plaintiff on a PIP. *Id.* at 12 (McVey Decl. ¶ 35). On September 29, 2021, McVey sent a human-resources employee a draft PIP for plaintiff. Doc. 137 at 8 (PTO ¶ 2.a.xv.). On October 15, 2021, McVey asked a different human-resources employee to accelerate placing plaintiff on a PIP.[13] *Id.* (PTO ¶ 2.a.xvi.). McVey explained that there was "an escalating situation with" plaintiff that needed a resolution as soon as possible. Doc. 139-2 at 89 (McVey Decl. Ex. L). McVey wrote that plaintiff had failed to follow through on key tasks that affected major business opportunities, so he requested that they accelerate the PIP. *Id.*

---

[13]     Puzzlingly, plaintiff tries to controvert this fact. Doc. 141 at 25. But she stipulated to it in the Pretrial Order.

A few days later, McVey emailed plaintiff about a "triple wrap" project. *Id.* at 99 (McVey Decl. Ex. M). In McVey's view, plaintiff wasn't meeting expectations. *Id.* McVey gave specific examples of plaintiff's struggles with the project and concluded that "these outcomes reflect poor judgement." *Id.* And McVey decided to take the lead on the project, with plaintiff providing a supporting role. *Id.* at 100.

Plaintiff filed her charge of discrimination with the EEOC on November 5, 2021. Doc. 137 at 8 (PTO ¶ 2.a.xvii.). This filing occurred before McVey formally introduced the PIP to plaintiff and, in light of the filing, McVey and human resources decided not to present plaintiff formally with the PIP in 2021. Doc. 139-2 at 13 (McVey Decl. ¶ 36). Instead, defendant placed plaintiff on the PIP in May 2022—six months after plaintiff made her EEOC charge. Doc. 137 at 8 (PTO ¶ 2.a.xx.).

The PIP covered three areas of concern with plaintiff's performance: (1) delivering projects on time and at an acceptable standard, (2) failing to meet certain 2021 performance goals, and (3) plaintiff's late responses and "[a]ggressive and confrontational communication style[.]" Doc. 139-2 at 103 (McVey Decl. Ex. N). The PIP also included specific objectives and deadlines by which plaintiff needed to complete those objectives. *Id.* at 104–05. Plaintiff and McVey met regularly to discuss the PIP and plaintiff's progress. Doc. 137 at 8 (PTO ¶ 2.a.xxi.). Plaintiff maintains that the PIP wasn't warranted, but she cites no evidence to support this assertion. Doc. 141 at 26.

Plaintiff didn't meet all the PIP's goals. Doc. 139-5 at 120 (Pl. Dep. 290:4–9). Defendant proffers a few examples. In July 2022, McVey emailed Grant to note that plaintiff hadn't met deadlines for the B. cepacia project and had delivered incomplete content for the B.

cepacia and Legionella projects.[14]  Doc. 139-2 at 120 (McVey Decl. Ex. Q).  And the PIP required plaintiff "to be based in Lenexa to support local team members[.]"  *Id.* at 105 (McVey Decl. Ex. N).  Yet, after defendant put plaintiff on a PIP in May 2022, plaintiff continued to live in Maryland part time.  Doc. 139-5 at 126 (Pl. Dep. 306:17–24).  Plaintiff admitted that she wasn't coming into the office.[15]  *Id.* at 126–27 (Pl. Dep. 306:25–307:3).

An email chain confirms this issue.  On August 23, 2022, plaintiff informed McVey that she "will be working remote Aug 15-19"—though those dates had passed already.  Doc. 139-2 at 125 (McVey Decl. Ex. R).  Plaintiff also informed McVey that she'd work remotely in September.  *Id.*  McVey responded that remote work in September was "not acceptable and [went] against the requirement for your role to be in Lenexa as has already been communicated."  *Id.* at 124.  McVey emphasized that he expected plaintiff "to be Lenexa based in September."  *Id.*  McVey later realized that plaintiff's August request dates were out of order, and he told plaintiff, "Informing me after the fact that you were not in the office is not in line with expectations previously set and discussed throughout this PIP."  *Id.* at 123.  He also emphasized, "I want to be clear that you working remotely during the month of September is not approved[.]"  *Id.*

Plaintiff's final PIP progress review occurred in September 2022.  *Id.* at 136–37 (McVey Decl. Ex. S).  Of the five performance gaps listed in plaintiff's PIP, plaintiff had completed one satisfactorily.  *Id.*  With the other four, concerns remained, and deadlines went unmet.  *Id.*

---

[14]    Plaintiff tries to controvert this fact.  But she does so with one word:  "Controverted."  Doc. 141 at 28.  No cite to contrary evidence, no evidentiary objection—nothing.  As is well-established by now, that won't do.  So, this fact is uncontroverted.

[15]    Plaintiff again attempts to controvert a fact merely with the word "Controverted."  Doc. 141 at 27.  This inadequate attempt fails like the rest.

Defendant discharged plaintiff on October 6, 2022.[16]  Doc. 137 at 8 (PTO ¶ 2.a.xxv.). Defendant's stated reason for terminating plaintiff:  failure to successfully meet expectations outlined in the PIP.  *Id.* (PTO ¶ 2.a.xxvi.).  Plaintiff filed a second EEOC charge in November 2022.[17]  *Id.* (PTO ¶ 2.a.xviii.).

## II.        Legal Standard

Summary judgment is appropriate when the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 247–48.

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v.*

---

[16]    For reasons the court can't grasp, plaintiff attempts to controvert this fact.  Doc. 141 at 28.  But she stipulated to this fact in the Pretrial Order.

[17]    The Pretrial Order places this second EEOC charge in 2021, not 2022.  Doc. 137 at 8 (PTO ¶ 2.a.xviii.).  The parties seem to agree that this is a typo.  Defendant's summary-judgment brief lists a November 2022 date, Doc. 139 at 28, and plaintiff doesn't controvert this fact, Doc. 141 at 29.  And the Second Amended Complaint also provides a November 2022 date.  Doc. 10 at 3 (2AC ¶ 14).

*Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).  When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

The federal courts don't view summary judgment as a "disfavored procedural shortcut."  *Celotex*, 477 U.S. at 327.  To the contrary, it's an important procedure "designed 'to secure the just, speedy[,] and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

### III.      Analysis

Plaintiff brings claims under Title VII, 42 U.S.C. § 1981, and the Equal Pay Act.  The court begins with the Title VII and § 1981 claims, which require most of its attention.  The analysis concludes with the EPA claim.

Title VII and § 1981 have significant overlap.  "Title VII makes it unlawful 'to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race,

21

color, religion, sex, or national origin.'"  *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th

Cir. 2012) (quoting 42 U.S.C. § 2000e-2(a)(1)).  Section 1981 also prohibits an employer from

discriminating against an employee on the basis of race.  *See* 42 U.S.C. § 1981(a), (b).  The

"standards and burdens under § 1981 are the same as those under Title VII[.]"  *Aramburu v.

Boeing Co.*, 112 F.3d 1398, 1410 (10th Cir. 1997).

A plaintiff may use direct evidence or indirect evidence, or both, to support Title VII and

§ 1981 claims.  *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019).  At the summary-

judgment stage, the court analyzes indirectly supported claims under the burden-shifting

framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Khalik*, 671 F.3d at

1192.  Under *McDonnell Douglas*, a plaintiff, *first*, must establish a prima facie case.  *Bekkem*,

915 F.3d at 1267.  The "burden on the employee to establish a prima facie case is light[.]"  *Guy

v. McDonough*, No. 20-6158, 2021 WL 3854764, at *2 (10th Cir. Aug. 30, 2021).  *Second*, if

plaintiff satisfies the obligations for a prima facie case, then the burden shifts to defendant, who

must produce "'a legitimate nondiscriminatory reason for its employment decision.'"  *Bekkem*,

915 F.3d at 1267 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).  As is

the employee's burden at the first step, the employer's burden at this second stage is

"exceedingly light."  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007) (quotation

cleaned up).  *Last*, if defendant succeeds at the second step, the burden shifts back to the

plaintiff, who then must "show that there is a genuine dispute of material fact" whether "the

employer's proffered reason for the challenged action is pretextual—*i.e.*, unworthy of belief."

*Bekkem*, 915 F.3d at 1267 (quotation cleaned up).

Against this backdrop, the court begins with a procedural kerfuffle over plaintiff's claim

of national-origin discrimination.  The court then analyzes plaintiff's claim that defendant failed

to promote her based on her race and sex.  Next, the court considers plaintiff's claim that defendant terminated her based on her race and sex.  The court then shifts gears to plaintiff's claim that defendant retaliated against her after she reported race discrimination.

### A.      National-Origin Discrimination

In the Pretrial Order, plaintiff asserts a claim for "race and/or national origin" discrimination.  Doc. 137 at 28–29 (PTO ¶¶ 4.a.i., iii., iv., vi.).  Defendant objects, asserting that the Pretrial Order is the first time that plaintiff has asserted a claim for national-origin discrimination.  Doc. 139 at 34.  Defendant's right.  Nowhere in plaintiff's Complaint, First Amended Complaint, or Second Amended Complaint does she mention national-origin discrimination.  *See* Doc. 1, Doc. 8, Doc. 10.  Nor does plaintiff's EEOC Charge of Discrimination mention national-origin discrimination.  Doc. 10-1.  That's a problem—for plaintiff.

Courts "do not normally expect to see claims . . . not contained in the pleadings appearing for the first time in the pretrial order[.]" *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002).  "Such a practice deprives one's adversary of fair notice, possibly discovery, and the opportunity for motion practice, and is subject to abuse by those who employ a sporting theory of justice." *Id.* at 1215–16.  When a party adds a new claim to a pretrial order, three things should happen:  (1) defendant should object, (2) plaintiff should add the new claim "with specificity and clarity," and (3) the court should "consider whether to approve or deny what [was] obviously an attempt to amend the pleadings at a rather late date." *Id.* at 1216.

The first step occurred—defendant has expressed its unhappiness with this late-breaking addition.  Doc. 137 at 32 (PTO ¶ 4.b.xviii.).  The second step didn't, however.  Plaintiff just threw her national-origin discrimination claim on top of her race discrimination claim without a word. *See generally id.*  And plaintiff's summary-judgment response never bothers to explain.

23

*See generally* Doc. 141.  This omission dooms plaintiff's chances at the third step—approval of this belated, unexplained amendment.

The deadline for plaintiff to move to amend her Complaint was November 1, 2023.  Doc. 20 at 7.  When "the scheduling order deadline for a motion to amend the pleadings has expired, the party seeking leave to amend must (1) demonstrate good cause for modifying the scheduling order under Fed. R. Civ. P. 16(b)(4), and (2) satisfy the standards for amendment under Fed. R. Civ. P. 15(a)."  *Cheatham v. Dedeke*, No. 22-3132-TC-ADM, 2024 WL 4227230, at *1 (D. Kan. Sept. 18, 2024).  As just mentioned, plaintiff never acknowledges that she's thrown a new claim in defendant's direction—much less shown good cause for the late throw.  *See generally* Doc. 137; Doc. 141.

The court thus denies plaintiff's attempt to amend her claims to include a national-origin discrimination claim.

### B.      Failure to Promote

Plaintiff asserts that defendant failed to promote her because of her race, violating Title VII and 18 U.S.C. § 1981.  Doc. 137 at 28 (PTO ¶ 4.a.i, iv.).  And she brings another claim alleging that defendant failed to promote her because of her sex, violating Title VII.  *Id.* at 29 (PTO ¶ 4.a.vii.).  This case's Pretrial Order encompasses 12 positions that plaintiff applied for over the years.[18]  Doc. 137 at 3–7 (PTO ¶¶ 2.a.ix–x.).  Defendant argues that plaintiff's failure-

---

[18]      Plaintiff suggests that she applied to positions beyond these 12, and faults defendant for lacking documentation of her applications.  Doc. 141 at 38.  But it's far from clear what plaintiff wants the court to do about this condition.  If plaintiff had problems with defendant's discovery responses, she should've filed a timely motion to compel.  *Escalante v. LifePoint Hosp. Inc.*, No. 17-2035-HLT, 2019 WL 2743910, at *4 (D. Kan. July 1, 2019) ("Defendant did not move to compel and cannot now ambush Plaintiffs at the summary judgment stage without having raised these issues earlier." (footnote omitted)).  Summary judgment certainly isn't the time to raise it.  Nor has plaintiff explained what these documentation problems have to do with her claims.  In any event, on a failure-to-promote claim, plaintiff bears the burden to "identify specific positions for which [she] applied and was rejected[.]"  *Velazquez v. Helmerich & Payne Int'l Drilling Co.*, No. 15-CV-0017-CVE-TLW, 2016 WL 379248, at *8 (N.D. Okla. Jan. 29, 2016).  It's "not sufficient for a plaintiff to generally allege that [she] was denied promotions."

to-promote claim based on some of these 12 positions is time-barred.  The court starts there, then moves to the merits of the claims.

### 1.    Timeliness

Title VII and § 1981 have different deadlines.  Title VII requires a plaintiff to file a charge within 300 days of the alleged unlawful employment practice.  42 U.S.C. § 2000e-5(e)(1).  A "claim accrues when the disputed employment practice—the demotion, transfer, firing, refusal to hire, or the like—is first announced to the plaintiff."  *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1177 (10th Cir. 2011).  Here, plaintiff filed her first charge of discrimination on November 5, 2021.  Doc. 137 at 8 (PTO ¶ 2.a.xvii.).  Title VII's timeliness requirement thus bars plaintiff from challenging any employment practice that occurred before January 9, 2021.  Before that date, defendant informed plaintiff that it wasn't hiring her for six of the 12 challenged positions.[19]  Plaintiff doesn't even try to assert that her Title VII claims based on these six positions are timely; she's all but abandoned them.  *See* Doc. 141 at 46–47.  The court thus grants defendant summary judgment against plaintiff's Title VII failure-to-promote claims based on these six positions.  They're time-barred.

Plaintiff does, however, fight for her § 1981 claims and argues that her § 1981 failure-to-promote claims based on all 12 positions are timely.  The timeliness of a § 1981 claim in this

---

*Id.*  So, the court won't consider any failure to promote plaintiff to a position not specified in the Pretrial Order.

[19]    Here, the court catalogs those six positions and the relevant date for statute-of-limitations purposes:  (1) the Value Stream Manufacturing Manager position closed on August 14, 2017, Doc. 139-3 at 5 (Owen Decl. ¶ 14); (2) the Senior Manager, Marketing Programs and Communications position closed on June 17, 2019, *id.* (Owen Decl. ¶ 17); (3) the Pharma & Biopharma Vertical Marketing Manager position closed on November 4, 2019, *id.* at 6 (Owen Decl. ¶ 20); (4) the Value Stream Manager position closed on March 9, 2020, *id.* at 7 (Owen Decl. ¶ 23); (5) defendant cancelled the Senior Manager, Inside Sales job requisition on March 18, 2020, *id.* at 7 (Owen Decl. ¶ 25); (6) for the Senior Manager, Marketing position, defendant notified plaintiff on October 30, 2020, that it didn't select her, *id.* at 8 (Owen Decl. ¶ 30).

context requires a bit of a detour through the history of failure-to-promote claims under § 1981 and the statute of limitations for claims brought under federal laws.  The court conducts this detour chronologically.

Section 1981, originally enacted in 1866, doesn't have its own statute of limitations.  To fill this void, the Supreme Court used to recommend that courts apply "the most appropriate or analogous state statute of limitations" to § 1981 claims.  *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987), *superseded by statute*, Judicial Improvements Act of 1990, Pub. L. No. 101-650 § 313, 104 Stat. 5114 (codified as 28 U.S.C. § 1658), *as recognized in Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004).  In Kansas, that means a two-year statute of limitations.  Kan. Stat. Ann. § 60-513(a)(4).

In a 1989 decision, *Patterson v. McLean Credit Union*, the Supreme Court held that § 1981 "does not apply to conduct which occurs after the formation of a contract[.]"  491 U.S. 164, 171 (1989).  Applying this rule to the failure-to-promote context, *Patterson* held that "whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer."  *Id.* at 185.  If the promotion would have changed the employee's position sufficiently, "then the employer's refusal to enter the new contract is actionable under § 1981." *Id.*  So, under *Patterson*, only when "the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981."  *Id.*  And the Court gave an example of an actionable § 1981 failure-to-promote claim: refusing to promote a law-firm associate to partner.  *Id.* at 185–86.

In 1990, Congress filled the statute-of-limitations void, enacting a four-year statute of limitations, 28 U.S.C. § 1658, for any "civil action arising under an Act of Congress enacted

26

after the date of the enactment of" § 1658—December 1, 1990.  Putting it another way, § 1658 provides a four-year, catch-all statute of limitations for civil actions brought under federal statutes, if those statutes were enacted after December 1, 1990.

In 1991, Congress overruled *Patterson* and amended § 1981 to allow plaintiffs to bring race-discrimination claims over the "termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of that contractual relationship."  § 1981(b).  The 1991 amendment "enlarged the category of conduct that is subject to § 1981 liability."  *Rivers v. Roadway Express*, 511 U.S. 298, 303 (1994).  And it did so by making employers liable for post-formation conduct.  *See Cross*, 390 F.3d at 1288.

Here's why this brief history lesson matters.  Congress enacted § 1981 liability for post-formation conduct in 1991—after it enacted § 1658's catch-all statute of limitations for actions arising under a post-1990 act of Congress.  So, if a plaintiff's § 1981 failure-to-promote claim was made possible by Congress's 1991 amendment, then § 1658's four-year statute of limitations applies.  On the other hand, if a plaintiff could've brought a failure-to-promote claim under *Patterson*, then plaintiff didn't need Congress's 1991 amendment.  In that situation, plaintiff's claim didn't arise under an act of Congress enacted after December 1, 1990, as § 1658 requires.  Instead, her claim arises under the nineteenth-century version of § 1981.  And if § 1658 doesn't apply then, once again, there's no federal statute of limitations.  All that leads right back to where this began:  the analogous state statute of limitations.  *See Jones*, 541 U.S. at 382.

This statute-of-limitations question thus boils down to whether plaintiff could've brought her failure-to-promote claim under *Patterson*.  *Patterson* requires "a meaningful, qualitative change in the contractual relationship" based on "actual changes in responsibility and status."  *Cross*, 390 F.3d at 1289 (quotation cleaned up).  If the job plaintiff sought would've produced

27

such a change, then the statute of limitations is two years. If not, the statute of limitations lasts four years.

Plaintiff misses this nuance completely, insisting that all failure-to-promote claims rely on an employer's post-formation conduct and are subject to § 1658's four-year statute of limitations. Doc. 141 at 46. She even calls defendant "flat wrong" for suggesting that the court might use Kansas's two-year statute of limitations. *Id.* It's plaintiff who is wrong. *Patterson* allowed for failure-to-promote claims under § 1981 when "the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer[.]" 491 U.S. at 185. The court conducts this inquiry, next.

Defendant insists that plaintiff's failure-to-promote claims fall under *Patterson* and so the two-year statute of limitations applies because many of the jobs plaintiff applied to "were not normal career progression positions." Doc. 139 at 37. To demonstrate that plaintiff was applying for jobs that would create a new and distinct relationship between her and defendant, defendant relies heavily on its band system. Of the six potentially untimely jobs,[20] five were Band 8 jobs. Doc. 139-3 at 4–8 (Owen Decl. ¶¶ 13, 16, 22, 25, 29). McMackin testified that "to go from a band 6 to a band 8 is a very large increase." Doc. 139-8 at 4 (McMackin Dep. 357:22–23). According to McMackin, "multi-band increase[s]" represent "less than one percent of" defendant's promotions. *Id.* (McMackin Dep. 357:23–25). Eng testified that a jump from Band 6 to Band 8 is possible, but it's "uncommon . . . because the competencies needed to . . . get to the band 8 level [are] a pretty significant jump." Doc. 139-10 at 5 (Eng Dep. 73:5–14). Plaintiff testified that she was told—more than once—that going "from a Band 6 to a Band 8 is not . . . a

---

[20]    Plaintiff filed this lawsuit on November 8, 2022. Doc. 1. So, if the two-year statute of limitations applies, then any promotions denied her before November 8, 2020, are untimely. This eliminates the same six positions identified as untimely in the Title VII analysis. *See above* n.19.

28

normal progression." Doc. 139-5 at 95 (Pl. Dep. 222:6–18). And she admitted that, from 2017 to 2022, she didn't know anyone who made the jump from Band 6 to Band 8, or even a two-band jump of any kind. *Id.* at 96 (Pl. Dep. 223:7–14).

Defendant also argues that the positions had different job functions and were in different divisions. Doc. 139 at 37. Indeed, the lone Band 7 position—Pharma & Biopharma Vertical Marketing Manager—was within the Analytical Instruments Group and the Chromatography and Mass Spectrometry Division. Doc. 139-3 at 35 (Owen Decl. Ex. E.). Recall that plaintiff worked as a Product Management Specialist III in the Microbiology Division within the Specialty Diagnostics Group. Doc. 137 at 2 (PTO ¶ 2.a.iv., vii.). In sum, defendant has adduced evidence that the positions to which plaintiff applied would've led to "actual changes in responsibility and status." *Cross*, 390 F.3d at 1289 (quotation cleaned up).

Plaintiff fails to respond to defendant's argument. So convinced she's right about the § 1981 statute of limitations, plaintiff never engages in the analysis required to reach that four-year statute of limitations. *See generally* Doc. 141. The court declines to concoct an argument for her. *See Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) ("Th[e] court, however, will not craft a party's arguments for him."). As a consequence, defendant has made an uncontested argument, supported by undisputed summary-judgment facts, showing that each of the six positions would have represented a new and distinct relationship between plaintiff and defendant. Plaintiff hasn't adduced any facts or proffered any argument, so no reasonable factfinder could disagree with defendant. It's a walkover.

In sum, the court grants defendant summary judgment against plaintiff's § 1981 failure-to-promote claims based on all positions denied before November 8, 2020. The court next turns to the merits of plaintiff's timely failure-to-promote claims.

29

### 2. Merits

Plaintiff alleges that defendant unlawfully failed to promote her because of her race and sex. To make a prima facie case of employment discrimination based on a failure to promote, plaintiff must show "that (1) she belongs to a protected class; (2) she applied for an available position for which she was qualified; (3) she was rejected under circumstances which give rise to an inference of unlawful discrimination." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (quotation cleaned up). The court assumes without deciding that plaintiff has met her prima-facie burden and thus moves to step two—defendant's reasons for not promoting plaintiff. It takes up each of the six positions in turn.

### a. Legitimate, Non-Discriminatory Reason for Failing to Promote Plaintiff

At step two of the *McDonnell Douglas* framework, defendant must articulate a legitimate, nondiscriminatory reason for its failure to promote plaintiff to the six positions. Defendant's burden there is, as already stated, an exceedingly light one. Defendant's overarching theme: it hired a better-qualified candidate.

The first position was a Value Stream Manager, which plaintiff applied for in August 2020. Doc. 137 at 4 (PTO ¶ 2.a.ix.f.i.). Defendant classified this position as a Band 8 job. *Id.* at 5 (PTO ¶ 2.a.ix.f.iii.). Defendant hired a Hispanic male for the role. The applicant was external, held a bachelor's degree in industrial engineering, seven years' experience as an engineer, and 12 years' experience as a manufacturing manager supervising more than 250 employees. Doc. 139-3 at 8 (Owen Decl. ¶ 28). After she applied for the role, plaintiff received feedback that a two-band jump "is difficult" and she'd "been out of operation[s] for 8+ years." Doc. 139-9 at 12 (Grant Dep. Ex. 55). Feedback notes also suggested that plaintiff could have "better

30

collaboration" on "new SKUs." *Id.* And an interviewer noted "not getting a sense of true leadership" from plaintiff's interview. *Id.*

The second position was a Market Development Manager, Genetic Testing Solutions that plaintiff applied for in February 2024. Doc. 137 at 5 (PTO ¶ 2.a.x.a.i.). This was a Band 7 job. *Id.* (PTO ¶ 2.a.x.a.iii.). Defendant hired a white female—an external applicant with a bachelor's degree in public health and five years' experience as a sales manager and account executive. Doc. 139-3 at 9 (Owens Decl. ¶ 35). The hiring manager wrote that plaintiff "didn't have the experience I am looking for specifically for demand generation so I'm going to pass on her." Doc. 139-5 at 180 (Pl. Dep. Ex. 34).

The third position was a Vertical Marketing Manager (Vaccines, MAbs) position, which plaintiff applied for in February 2021. Doc. 137 at 6 (PTO ¶ 2.a.x.b.i.). This was a Band 7 job. *Id.* (PTO ¶ 2.a.x.b.iii.). And defendant ultimately hired an internal applicant, a white female, from a Band 7 position with a bachelor's degree in business administration with a marketing concentration and 18 years' experience in marketing roles. Doc. 139-3 at 10 (Owen Decl. ¶ 38). According to its internal documentation, defendant declined to hire plaintiff for this position because she wasn't the best qualified candidate. Doc. 139-10 at 7.

The fourth position was a May 2021 Senior Global Pharma & BioPharma Marketing Manager position. Doc. 137 at 6 (PTO ¶ 2.a.x.c.i.). This was a Band 8 position—another two-band jump. *Id.* (PTO ¶ 2.a.x.c.iii.). Defendant hired an Asian female: an external applicant with a bachelor's degree in pharmacology, graduate diploma in business administration and management, 14 years' experience in sales and marketing, and prior work as a Senior Global Brand Manager. Doc. 139-3 at 11 (Owen Decl. ¶ 41). Defendant points out that, as of 2021,

31

plaintiff had only nine years of experience in marketing. *See* Doc. 139-3 at 15–17 (Owen Decl. Ex. A).

The fifth position was a Senior Manager of Product Management position which plaintiff applied for in January 2022. Doc. 137 at 6 (PTO ¶ 2.a.x.d.i.). This was another Band 8 job. *Id.* at 7 (PTO ¶ 2.a.x.d.iii.). Defendant hired a white man—an internal applicant from a Band 7 position with a bachelor's degree in economics, MBA, eight years' experience at defendant, eight years' management experience at Sony, and 10 years' experience in finance. Doc. 139-3 at 12 (Owen Decl. ¶ 44). The hiring manager declined to interview any Band 6 applicants for this job, which eliminated plaintiff from the running. *Id.* (Owen Decl. ¶ 43).

The sixth and final position was a Manager of Marketing Programs job that plaintiff applied for in January 2022. Doc. 137 at 7 (PTO ¶ 2.a.x.e.i.). This was a Band 7 job. *Id.* (PTO ¶ 2.a.x.e.iii.). Defendant hired a white woman for this job. *Id.* (PTO ¶ 2.a.x.e.ii.). This hired candidate was an external applicant with a bachelor's degree in business administration and more than ten years' experience in financial and marketing analysis. Doc. 139-3 at 12–13 (Owen Decl. ¶ 47). The hiring manager wrote that she "really liked" plaintiff, but plaintiff "fell short on answering several of the more marketing-oriented questions" asked in the interview. Doc. 139-5 at 170 (Pl. Dep. Ex. 30).

Defendant thus has satisfied its burden to articulate a legitimate, non-discriminatory reason for not promoting plaintiff to each position. The burden now shifts to plaintiff to demonstrate that these reasons are pretextual ones.

### b. Pretext

To shoulder her burden at the third step of the *McDonnell Douglas*, plaintiff must show that her sex or race was a determinative factor in defendant's refusal to promote her, and the explanations it has articulated for those decisions, above, are merely pretextual. *Tabor*, 703 F.3d

32

at 1217.  Plaintiff can shoulder this burden many different ways, but here are two common

routes:

> (1) by showing that the proffered reason is factually false or
>
> (2) by showing that discrimination was a primary factor in the employer's decision, which is often accomplished by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.

*Id.* at 1218 (quotation cleaned up).

Plaintiff can't shoulder this burden because she simply doesn't try.  Her summary-

judgment brief mentions the word "pretext" just two times.  *See generally* Doc. 141.  That's a

problem.  *See Garcia v. Wyo. Dep't of Health & Soc. Servs.*, No. 20-8052, 2021 WL 4844293, at

*4 (10th Cir. Oct. 18, 2021) ("By failing to point to any portion of the record to suggest pretext,

she inadequately briefed this issue and has thus waived her argument.").  Instead, plaintiff argues

that sham affidavits provided defendant's evidence about the more-qualified candidates, so a fact

issue remains.  *Id.* at 51.  Relying on this argument was a mistake.  Plaintiff's sham-affidavit

argument is woefully inadequate.  *See above* § I.A.  Having placed all her eggs in this defective

basket, plaintiff's failure-to-promote claims fall to the floor.  They can't recover.

Defendant thus deserves summary judgment against plaintiff's failure-to-promote claims.

### C.    Termination

Plaintiff next asserts that defendant fired her based on her race, violating Title VII and

§ 1981.  Doc. 137 at 28–29 (PTO ¶ 4.a.iii., vi.).  Plaintiff also asserts that defendant fired her

based on her sex, violating Title VII.  *Id.* at 29 (PTO ¶ 4.a.viii.).  A "plaintiff alleging wrongful

termination may raise an inference of unlawful discrimination by showing that (1) she is a

member of a protected class, (2) she was qualified for her job, (3) she was fired, and (4) the job

was not eliminated."  *Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Okla. Bd. of*

*Regents*, 125 F.4th 1321, 1335 (10th Cir. 2025). The court assumes without deciding that plaintiff has satisfied her burden to show a prima-facie case, and so it moves on to step two.

At step two, defendant has proffered the following reason for terminating plaintiff's employment: her failure to meet the PIP's requirements. Doc. 139 at 44. Plaintiff doesn't dispute that she failed to satisfy the PIP. Doc. 139-5 at 120 (Pl. Dep. 290:4–9). Given that concession, along with plaintiff's documented performance issues, the court concludes that defendant has shouldered its "exceedingly light" burden to articulate a legitimate, nondiscriminatory reason for terminating plaintiff's employment. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (quotation cleaned up).

The burden thus shifts to plaintiff to demonstrate this reason for firing plaintiff is a pretext, and defendant actually fired her because of her race or sex. Plaintiff doesn't organize her thoughts around the *McDonnell Douglas* framework, so it's difficult to tell what her pretext argument is (if indeed she asserts one at all). As already mentioned, plaintiff mentions pretext just twice in her brief. *See generally* Doc. 141. The court tries to draw a pretext argument out of these two mentions.

The first time plaintiff mentions pretext, she asserts—without citing any evidence in the summary-judgment record—that defendant denied her 2019 request to work remotely as a pretext to push plaintiff out of the company. Doc. 141 at 8. This fact says nothing about plaintiff's failure to complete the PIP in 2022. The three-year-old denial of a work-from-home request doesn't show that defendant's reason for firing plaintiff is false. Nor does it demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in defendant's given reason: plaintiff got fired because, as she admits, she didn't complete the PIP. *Tabor*, 703 F.3d at 1218.

34

The second time plaintiff mentions pretext, she asserts that McVey treated her differently than other, similarly situated employees, and treated white, European men more favorably. Doc. 141 at 51. In support, plaintiff asserts that McVey recommended that his white, European direct report, who held the same title as plaintiff, receive a higher bonus than plaintiff in 2020.[21] This differential-treatment argument starts on strong footing.

As our Circuit has explained, "showing disparate treatment—by demonstrating that the employer treated employees similarly situated to the plaintiff employee differently (i.e., more favorably)—is a particularly potent instrument to discredit an employer's allegedly legitimate reasons." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1311 (10th Cir. 2017). But plaintiff's attempt to invoke this particularly potent instrument falters almost immediately because the relevant inquiry asks whether "the employer treated the plaintiff differently from other *similarly-situated* employees who violated work rules of comparable seriousness[.]" *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (emphasis added) (quotation cleaned up). Put differently, similarly situated employees are those employees "reporting to the same supervisor, held to the same standards, and afoul of those standards at least to the same degree." *Roberts v. Int'l Bus. Machs. Corp.*, 733 F.3d 1306, 1310 (10th Cir. 2013).

Plaintiff here hasn't adduced any evidence to show that her white, European, male colleague had performance struggles similar to hers. All plaintiff has shown is that this colleague, two years before her termination, got a bigger bonus. That's it. And that lone fact can't cut it. If "the employer's differential treatment of similarly-situated employees is trivial

---

[21]     Plaintiff cites Exhibit 6 for this proposition, Doc. 141 at 41, but Exhibit 6 appears to have fallen victim to plaintiff's struggle to marshal summary-judgment evidence. Exhibit 6 is a completely blacked-out document. *See* Doc. 141-6 at 2 (Pl. Ex. 6). Plaintiff separately emailed the court unredacted exhibits, but her email didn't contain Exhibit 6. But, because defendant doesn't dispute this fact, Doc. 148 at 14, the court will accept it for purposes of this summary-judgment motion.

. . . , such treatment is insufficient to create an inference of discrimination." *Swackhammer*, 493 F.3d at 1168 (quotation cleaned up). This claim isn't about plaintiff's bonus in 2020. It's about plaintiff's termination in 2022. The bonus difference amounts to trivial differential treatment that doesn't suffice to demonstrate pretext. *See Stephens v. City of Topeka*, 33 F. Supp. 2d 947, 962 (D. Kan. 1999) ("An isolated instance of disparate treatment of another individual, unrelated to the present action, does not suffice to show pretext."), *aff'd*, 189 F.3d 478, 1999 WL 668364 (10th Cir. 1999), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018). And so, from this bonus discrepancy, no reasonable factfinder could infer that defendant had a discriminatory motive when it fired plaintiff.

To the extent plaintiff asserts that some other summary-judgment facts demonstrate pretext, the court rejects those arguments as inadequately briefed. *E.g.*, *United States v. Moya*, 5 F.4th 1168, 1192 (10th Cir. 2021) (explaining that litigants waive arguments "when they are inadequately presented" (quotation cleaned up)); *Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020) ("This briefing-waiver rule applies equally to arguments that are . . . presented only in a perfunctory manner." (quotation cleaned up)). For example, plaintiff suggests—in passing and without citing any record facts—that McVey "initiated a faux performance improvement plan to oust Plaintiff" after she had requested to work from home. Doc. 141 at 50. To the extent plaintiff is attacking the PIP to show pretext, this argument is waived as inadequately briefed. And, in any event, plaintiff has failed to controvert effectively the facts demonstrating the problems with her performance that led to the PIP.

In sum, plaintiff has failed to shoulder her burden to demonstrate pretext. Defendant thus deserves summary judgment against plaintiff's claims that defendant fired her based on her race or sex.

36

### D.      Retaliation

Plaintiff also alleges that defendant retaliated against her after she reported racial discrimination, violating Title VII and § 1981.  Doc. 137 at 28 (PTO ¶ 4.a.ii., v.).  "To establish a prima facie case of retaliation, a plaintiff must show that:  (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action."  *Walkingstick Dixon*, 125 F.4th at 1339 (quotation cleaned up).  Plaintiff alleges defendant retaliated against her in two ways:  denying her requests to work remotely and placing her on the PIP.  Doc. 137 at 28 (PTO ¶ 4.a.ii., v.).  The court considers each, in turn, below.  But, first, it pauses to identify plaintiff's briefing struggles with this argument.

Plaintiff doesn't devote any pages in her limited analysis to this retaliation claim.  *See* Doc. 141 at 44–54.  Indeed, she mentions retaliation just four times over the course of her 54-page brief and, each time, she merely lists her claims, *id.* at 3, 46, or recites defendant's argument, *id.* at 4.  The court could reject plaintiff's arguments outright as inadequately briefed; as already mentioned, the court doesn't gin up arguments for parties.  The court nonetheless does its best to derive some order and substance from plaintiff's scattershot briefing.

### 1.      Denial of Remote-Work Requests

For the first form of retaliation, defendant targets the second element of a prima facie case, arguing that denial of a remote-work request doesn't qualify as an adverse employment action.  To qualify as an adverse employment action, "the challenged action must be materially adverse."  *Culp v. Remington of Montrose Golf Club, LLC*, 133 F.4th 968, 977 (10th Cir. 2025) (quotation cleaned up).  "An employer action is materially adverse if it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* (quotation cleaned up).  Courts "examine claims of adverse action through a case-by-case

37

approach, examining the unique factors relevant to the situation at hand." *Id.* (quotation cleaned up).

Other courts have held that denying a remote-work request doesn't qualify as an adverse employment action sufficient to support a retaliation claim. *See Bush v. La. Homecare of Miss-Lou*, No. 24-106, 2025 WL 1873001, at *4 (W.D. La. July 7, 2025) (concluding "denial of remote work privileges" didn't qualify as an adverse employment action for purposes of retaliation claim); *Ray v. N.Y. State Ins. Fund*, No. 16 CIV. 2895 (NRB), 2018 WL 3475467, at *11 (S.D.N.Y. July 18, 2018) (denying remote-work request couldn't support retaliation claim because "the mere inconvenience of working from a different location does not, without some other impact, rise to the level of an adverse employment action.").

The facts here drive the same conclusion. Though plaintiff worked remotely during the pandemic, plaintiff's position as a Global Brand Manager was based in Lenexa. Doc. 139-3 at 4 (Owen Decl. ¶ 11); *see also id.* at 19 (Owen Decl. Ex. B). Consistent with this view, when plaintiff first asked to work fully remote in 2019, defendant denied the request "for business and operational reasons." Doc. 139-2 at 5 (McVey Decl. ¶ 12). After the pandemic, when defendant asked all U.S.-based employees to return to work on-site at least three days per week, plaintiff asked defendant to except her from this rule for 15 months. *Id.* at 9–10 (McVey Decl. ¶ 27). No reasonable jury could conclude that requiring plaintiff to remain at her established job site and follow the employer's three-day in-office requirement would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Culp*, 133 F.4th at 977 (quotation cleaned up).

The court, trying to distill plaintiff's argument from her evidence, notes plaintiff testified that she sought to work remotely in part because her position was a global one, and other global

product managers worked on a remote basis. Doc. 141-1 at 9 (Pl. Dep. 261:1–8). She also proffers evidence showing that other marketing roles were fully remote. Doc. 141-24 at 2 (Pl. Ex. 24). In an email, a human-resources employee told McVey,

> I've realized that over 60% of marketing roles are remote. And of the Lenexa based roles, the only diverse employees across the U.S. team happen to be Lenexa based. So we want to make sure that we have a fair and consistent rationale as to why marketing roles are remote or not remote in total.

*Id.* Evidence about other positions doesn't change this reality: plaintiff's position was based in Lenexa. And McVey explained the reasons why plaintiff was needed in Lenexa: (i) 60% of plaintiff's product portfolio was manufactured in Lenexa; (ii) leadership saw plaintiff's role as representative of brand marketing in Lenexa and wanted routine engagement with internal customers, and (iii) the role required on-site activities and training. Doc. 139-2 at 51–52 (McVey Decl. Ex. F). The court declines to second-guess defendant's decision to make the role Lenexa based. *See Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005) ("[C]ourts may not act as a super personnel department that second guesses employers' business judgments." (quotation cleaned up)).

### 2.    PIP

Defendant next argues that the other action plaintiff claims was retaliatory—placing her on the PIP—lacks a causal connection to her EEOC charge. Doc. 139 at 47–48. Plaintiff never responds to this argument and all but abandons this claim. *See generally* Doc. 141. And for good reason. As defendant points out, McVey prepared the PIP in the fall of 2021. Doc. 139-2 at 12–13 (McVey Decl. ¶ 35). That's nearly two years after plaintiff had complained of race discrimination when defendant denied her remote work request in November 2019. *Id.* at 35 (McVey Decl. Ex. D). And McVey decided to put plaintiff on the PIP before plaintiff filed her EEOC charge in November 2021. Doc. 137 at 8 (PTO ¶ 2.a.xvii.); Doc. 139-2 at 13 (McVey

39

Decl. ¶ 36).  No reasonable jury could find that defendant used the PIP to retaliate against plaintiff for opposing discrimination.  *See Mitchell v. Kan. City Kan. Sch. Dist.*, 714 F. App'x 884, 888–89 (10th Cir. 2017) (concluding plaintiff failed to show prima facie case of retaliation where employer had initiated termination proceedings before plaintiff filed his EEOC charge).

In sum, given plaintiff's poor briefing and the summary-judgment facts defendant has adduced, defendant deserves summary judgment against plaintiff's claims of retaliation.

### E.   Equal Pay Act

Plaintiff's final claim asserts that defendant paid her less than male employees performing substantially similar work, violating the Equal Pay Act.  Doc. 137 at 29 (PTO ¶ 4.a.xi.).  The EPA prohibits employers from discriminating by paying employees different rates on the basis of sex.  29 U.S.C. § 206(d)(1).  Plaintiff bears the burden to demonstrate a prima facie case of discrimination under the EPA.  *Riser v. QEP Energy*, 776 F.3d 1191, 1196 (10th Cir. 2015).  An EPA prima facie case has three elements:  (1) plaintiff "was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; (3) the male employees were paid more under such circumstances."  *Id.*  Defendant argues that plaintiff hasn't created a triable issue on elements one and two.

The court's analysis begins and ends with the first element:  substantially equal work.  "Work is 'substantially equal' for purposes of the EPA if it requires 'equal skill, effort, and responsibility.'"  *Id.* (quoting 29 U.S.C. § 206(d)(1)).  Job descriptions and job titles aren't enough—plaintiff must show "the actual content of the job[.]"  *Id.*  And jobs aren't substantially equal if they "are merely alike or comparable[.]"  *Id.*  That said, "insubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the

performance of jobs will not render the equal pay standard inapplicable." *Id.* (quotation cleaned up).  Defendant argues that plaintiff hasn't adduced any evidence about comparators who performed work substantially equal to her.  Doc. 139 at 50.  Plaintiff responds:  "Untrue."  Doc. 141 at 51.  But unfortunately for plaintiff, it is true, and undisputedly so.

Plaintiff's summary-judgment brief cites three facts in an attempt to meet her burden to show a prima facie EPA case:

- McVey made more money than plaintiff in 2018, *see* Doc. 141-9 (Pl. Ex. 9).

- Defendant identified 24 employees who had plaintiff's job profile within the U.S. in defendant's Specialty Diagnostics Group, Doc. 141 at 41.[22]

- Plaintiff identified additional comparators from marketing in the Specialty Diagnostic Group's Microbiology Division.  Doc. 141-8 at 2 (Pl. Ex. 8).

Doc. 141 at 51.  The problem with this evidence is an obvious one—plaintiff hasn't adduced any evidence about the work these colleagues performed.  She's adduced a chart of McVey's salary history, a bare assertion that other employees shared plaintiff's job profile, and a chart of other employees in the Specialty Diagnostics Group's Microbiology Division.  What's missing?  Any evidence about the "actual content" of these jobs.  *Riser*, 776 F.3d at 1196.  Plaintiff can't meet her prima facie burden relying on "mere job descriptions or titles."  *Id.*  What's more, plaintiff testified to her unique role; she was "the only one" in a marketing position with 10 years of operations' experience, so defendant "always wanted [her] to do operations and marketing."  Doc. 139-5 at 140 (Pl. Dep. 364:1–8).  And defendant hired a third party to conduct a pay-equity

---

[22]     Plaintiff's briefing woes continue.  The exhibit she cites for this fact, Exhibit 17, doesn't contain any information about these 24 employees.  Instead, Exhibit 17 is a November 2021 email conversation about keeping plaintiff on a team.  Doc. 141-17 at 2–3 (Pl. Ex. 17).  The court declines to go looking through plaintiff's exhibits to find the exhibit she meant to cite.  *See Triplett v. U.S. Dep't of Def.*, No. 11-2105-SAC, 2011 WL 1113551, at *1 (D. Kan. Mar. 24, 2011) ("[N]either the court nor the adverse parties should be required to 'try to fish a gold coin from a bucket of mud.'" (quoting *United States v. Lockheed–Martin Corp.*, 328 F.3d 374, 376–78 (7th Cir. 2003))).  Fortunately for plaintiff, defendant doesn't dispute this fact, Doc. 148 at 13, so the court will accept it for summary-judgment purposes.

study and the study determined that plaintiff's salary didn't require remediation.  Doc. 139-4 at 9

(McMackin Decl. ¶ 22).

In sum, no reasonable factfinder could conclude that plaintiff performed substantially

equal work to her male colleagues and defendant paid her less than it paid those colleagues.

Plaintiff thus has failed to shoulder her burden to prove a prima facie EPA case and defendant is

entitled to summary judgment on this claim.

## IV.        Conclusion

The court grants defendant's Motion for Summary Judgment (Doc. 138).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for

Summary Judgment (Doc. 138) is granted.

**IT IS SO ORDERED.**

**Dated this 28th day of May, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**